over. He thus had all the notice the ringing of the bell could have given
him, and the omission to ring it had nothing whatever to do with the ac-
cident."

Upon the facts shown by the plaintiff, the defendant was entitled
to a nonsuit.

Without regard to the disposition made of the question which we
have discussed, the judgment must be reversed. The trial justice
having become a member of the Appellate Division of the Second
Department, he had no power or jurisdiction thereafter to hear and
decide. The motion for a nonsuit reserved at the trial was heard
and decided. French v. Merrill, 27 App. Div. 612, 50 N. Y. Supp. 776.

Judgment reversed, with costs to the appellant to abide the event,
upon questions of law only; the facts having been examined, and
no error found therein. All concur; SPRING, WILLIAMS, and
HISCOCK, JJ., upon the ground of mistrial only.

_____

(108 App. Div. 142.)

### TURCK v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Third Department. October 24, 1905.)

RAILROADS—CROSSING ACCIDENTS—CONTRIBUTORY NEGLIGENCE.
    Evidence, in an action for death of one killed at a crossing by collision
    of a train with the automobile he was driving, *held* insufficient to sustain
    a finding that he was free from contributory negligence.

Appeal from Trial Term.

Action by William J. Turck, Jr., administrator of Harry L. Turck,
deceased, against the New York Central & Hudson River Railroad
Company. From a judgment on a verdict for plaintiff, and from an
order denying a motion for a new trial made on the minutes, defend-
ant appeals. Reversed.

Argued before PARKER, P. J., and SMITH, CHASE, CHES-
TER, and HOUGHTON, JJ.

Amos Van Etten, for appellant.
Howard Chipp and W. N. Gill, for respondent.

PARKER, P. J. The action was brought to recover damages for
negligently causing the death of the plaintiff's son. On the evening
of July 25, 1903, the plaintiff's son, Harry L. Turck, a young man 19
years of age and in possession of all his faculties, while riding in
an automobile with another young man of about the same age, was
struck and killed by a passenger train on the defendant's railroad at
a grade crossing just north of the city of Kingston. His companion
also died as the result of injuries then received. The highway upon
which the accident occurred is a public highway, known as the "Sauger-
ties Road," and is a continuation of Albany avenue, one of the princi-
ple streets of said city. It is well paved and is much traveled, espe-
cially in the summer, being one of the principal pleasure drives of the
people of Kingston. The defendant's railroad crosses the Saugerties
Road at an acute angle of about 27 degrees, 24 minutes. The high-
way is about 50 feet wide and runs northeasterly and southwesterly,

and the railroad runs north and south. At this crossing there are double tracks. The train that struck the deceased was a regular train, but on this evening it was some 20 or 25 minutes late, and was running at a high rate of speed on a down grade southerly towards Kingston, on the south-bound track; and a freight train, consisting of some 38 cars, had just passed over this crossing northerly on the north-bound track.

North of the crossing a tight board fence 8½ feet high runs along the westerly line of the highway for a distance of 763 feet, to within 140 feet from the nearest or easterly rail of the tracks, and then turns at an obtuse angle and runs for a distance of 40 feet to the easterly line of the railroad and thence northerly along such easterly line for a further distance of 723 feet. Approaching this crossing from the north, the direction from which the deceased approached it, this fence, of course, obstructs the view of the railroad to the north. But at the end of the fence upon the highway, which as above stated is about 140 feet from the tracks, a view northerly of the crossing may be had for perhaps a couple of hundred feet. At a point in the highway 100 feet from the nearest rail, a view may be had of the south-bound track for 340 feet northerly of the crossing. At a point 60 feet from such nearest rail, a view of such track may be had for a distance of fully 1,300 feet, which view increases as one approaches the crossing, until at a point in the highway 22 feet from such nearest rail the track may be seen for more than two miles northerly. Gates are operated at this crossing between 7 o'clock a. m. and 7 o'clock p. m. only; and at the time of the accident, which occurred shortly after 8 o'clock, the gates were up and it was becoming twilight. However, the view to the north is, to some extent, obstructed by the presence of the gate, a sign post, a wire fence and posts running from the railroad along the highway to the board fence, a cattle guard, and a telephone pole, and at certain points by a line of telegraph poles and some trees on the easterly side of the railroad along the board fence. But these obstructions are evidently more apparent than real. True, a person directly behind the telephone pole, which was 18 inches in diameter, could not see the track at all, and at a certain point in the highway the line of telegraph poles would form one continuous line of obstruction, but at either side of such points the view would again become clear. To the south, also, the railroad is evidently straight; but the respondent contends that the view thereof in that direction is obstructed by a flagman's shanty, a railroad gate, a small building (resembling a tool house), and by trees. To what extent these obstruct a view of the track does not clearly appear; but they certainly cannot excuse the exercise of diligence in watching out for trains approaching from the opposite direction.

At the time of the accident the deceased was driving the automobile, and was seated on the left side. It was a low machine, with but one seat, and the top of the cushion on the seat was only 3½ feet from the ground. The machine was about 6 feet long, and was of the kind commonly known as a "runabout." The deceased was accustomed to running the machine, having driven it a great many times—almost daily; and he was undoubtedly familiar with the crossing and with

the highway, which on either side of the crossing for a considerable distance is straight. Approaching the crossing from the north, however, there is a slight rise in the highway. As the deceased approached the crossing, Dr. Sahler, his wife, and Mrs. Gallagher were driving ahead of him in a surrey drawn by a team of spirited horses. They heard the honk of the horn on the automobile, and Mrs. Sahler and Mrs. Gallagher looked around and saw the two young men in the automobile talking together, but they did not then see either of them look for an approaching train; and it is not clear that looking at that time would have been availing. No one again saw them until the team had passed over the crossing and the train was upon them, when they were both seen to be looking up at the headlight of the engine, and at this instance came the crash.

There is a conflict of evidence as to whether any warning was given of the approaching train, and also as to its speed at that time; and upon the question of the defendant's negligence the conclusion of the jury should not be interfered with. But the remaining question, and the serious one to be considered, is, did the plaintiff establish by a fair preponderance of evidence that his intestate was free from contributory negligence? or was the finding of the jury to that effect against the weight of evidence?

It was the clear duty of the deceased to watch out for an approaching train as he entered upon the crossing. If the passing freight train obstructed his view, so as to render it unsafe, it was his duty to delay his crossing until that train had so far passed as to render his view a safe one. Such an obstruction was manifestly a temporary one, which required but a slight delay on his part to be entirely removed. Purdy v. N. Y. C. & H. R. R. R. Co., 87 Hun, 97, 33 N. Y. Supp. 952; Young v. N. Y., L. E. & W. R. R. Co., 107 N. Y. 500, 14 N. E. 434; Waddell v. N. Y. C. & H. R. R. R. Co., 98 App. Div. 343, 90 N. Y. Supp. 239. With such a situation confronting him, and such duties before him, he evidently followed closely upon Dr. Sahler's entrance upon the crossing, and whatever the doctor was able to see of the approaching train we must conclude the deceased was able to see, had he looked for it with the same care which the doctor used and which his duty required. Now, we are told by the doctor that he did not see the approaching train until just as he was about to enter upon the northbound track. Just how far he was from that track when he began to look for it does not appear; but at all events he was able to see it before his horses got so close to the south-bound track (which was the one on which the train was coming) that they could be hit by it, because he tells us that if he had had his other team he would have stopped them and allowed the train to pass before he crossed. But with the restive team which he did have he thought it safest to cross ahead of the train; thus indicating that when his horses entered upon the first track he saw the train so far off that he judged he could drive across both tracks in time to clear it, but also thought it was a hazard to attempt it. He just succeeded in clearing the train. Now, the deceased, who was just behind him, either did not see the train at all, or else misjudged its distance and was caught in a deliberate effort to also drive over ahead of it. There was no fractious team to force him to cross ahead

of the train, or to put him to a quick judgment as to which was safest to do. He could stop his machine quicker and in a shorter space than the team could be stopped, and when stopped it would stand steadily and in safety on the very north-bound track itself. A deliberate attempt to cross ahead of that train was beyond all doubt gross carelessness on the part of the deceased. If, however, it be said that his attempt was not deliberate, but that the train got upon him before he saw it, we cannot but conclude that he did not use that care in looking for it that he should have used. There is no reason shown, nor can we conceive of any, why he would not have seen the train, had he looked, at least as soon as the doctor saw it. Indeed, from the locality and situation, as above stated, a reasonably careful outlook for an approaching train would have disclosed the one approaching in ample time for the doctor to have stopped his team and held it at a safe distance from the crossing until such train had passed. At a distance of 20 feet or more from the first rail there was practically an unobstructed view for 2 miles or more to the north up the south-bound track. Such being the case, it is clear beyond a doubt that the deceased did not attempt that crossing with that care and watchfulness which his duties required from him. There is not only a failure to show freedom from contributory negligence on the part of the deceased, but the evidence points very distinctly to actual negligence on his part that contributed to his death.

I conclude that the judgment and order must be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur.